# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF GEORGIA
### MACON DIVISION

| | | |
|---|---|---|
| **TIMOTHY R. JOHNSON,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | **No. 5:15-CV-419 (CAR)** |
| **CITY OF WARNER ROBINS GEORGIA,** | : | |
| *et al.* | : | |
| | : | |
| **Defendants.** | : | |
| _____ | : | |

### ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Timothy R. Johnson filed this action alleging he was wrongfully arrested, prosecuted, and imprisoned for murder in 1984, and subsequently, after the Georgia Supreme Court overturned his murder conviction in 2006, he was maliciously re-prosecuted, and confined to administrative segregation for four and a half years awaiting his retrial, until a jury acquitted him of the charges in 2013, and he was released. Plaintiff asserts claims against the City of Warner Robins and various individual Defendants employed by the Warner Robins Police Department and the Houston County Sheriff's Office under 42 U.S.C. § 1983 and Georgia tort law centered around his alleged unlawful arrests and malicious prosecutions of the 1984 and 2006 murder charges and his lengthy confinement in administrative segregation awaiting his re-trial.

1

Specifically, Plaintiff asserts claims against the following Defendants: the City of Warner Robins, Georgia, (the "City") and the following officers of the Warner Robins Police Department ("W.R.P.D.") individually and in their official capacities as officers of the W.R.P.D.: Detective Deborah D. Miller; Lieutenant Malcolm H. Derrick, Jr.; Captain H.D. Dennard; Lieutenant R.G. West; Detective Brad Mules; and Captain Stephen D. Lynn (collectively referred to as the "City Defendants"); Houston County Sherriff Cullen Talton; Margaret Hays, a deputy of the Houston County Sheriff's Office; and General Granville, a detention officer at the Jail in 1984.

Before the Court are the City Defendants' Motion for Summary Judgment [Doc. 47]; Defendants Sheriff Talton and Deputy Hays's Motion for Summary Judgment [Doc. 53]; and Defendant Granville's Motion for Summary Judgment [Doc. 52]. After fully considering the record, the parties' arguments, and the relevant law, the Court finds Defendants are entitled to summary judgment on all of Plaintiff's claims except Plaintiff's substantive due process claim against Defendant Margaret Hays. Thus, the City Defendants' Motion for Summary Judgment and Defendant Granville's Motion for Summary Judgment [Docs. 47 and 52] are **GRANTED**; and Defendants Talton and Hays' Motion for Summary Judgment [Doc. 53] is **GRANTED IN PART AND DENIED IN PART**. Specifically, that Motion is GRANTED on all of Plaintiff's claims against Defendant Sheriff Talton; it is GRANTED on Plaintiff's procedural due process

claim against Defendant Margaret Hays; and it is DENIED on Plaintiff's substantive due process claim against Defendant Hays.

## LEGAL STANDARD

Summary judgment is proper if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1] The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact" and that entitles it to a judgment as a matter of law.[2] If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact.[3]

The Court must view the facts, and any reasonable inferences drawn from those facts, in the light most favorable to the party opposing the motion.[4] "The inferences, however, must be supported by the record, and a genuine dispute of material fact requires more than 'some metaphysical doubt as to the material facts.'"[5] In cases

---

[1] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986 ).

[2] *Celotex Corp.*, 477 U.S. at 323 (internal quotation marks omitted).

[3] *See* Fed. R. Civ. P. 56(e); *see also Celotex Corp.*, 477 U.S. at 324-26.

[4] *Penley v. Eslinger*, 605 F.3d 843, 848 (11th Cir. 2010); *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).

[5] *Logan v. Smith*, 439 F. App'x 798, 800 (11th Cir. 2011) (quoting *Penley*, 605 F.3d at 848).

where opposing parties tell different versions of the same events, and one is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts."[6] A disputed fact will preclude summary judgment only "if the dispute might affect the outcome of the suit under the governing law."[7] "The court many not resolve any material factual dispute, but must deny the motion and proceed to trial if it finds that such an issue exists."[8]

## BACKGROUND

Plaintiff's claims raise issues of whether the officers had probable cause to arrest and prosecute him in 1984 and in 2006, and whether his due process rights were violated by being confined in administrative segregation awaiting re-trial. Thus, the following facts, taken in the light most favorable to Plaintiff as the nonmoving party, chronicle the police investigation leading to Plaintiff's arrest and subsequent murder charges in 1984; the police investigation leading to Plaintiff's 2006 murder charges and re-trial in 2013 after the Georgia Supreme Court overturned his 1984 conviction; and the conditions surrounding Plaintiff's confinement as a pretrial detainee in administrative segregation while confined at the Houston County Jail awaiting his retrial.

---

[6] *Pourmoghani-Esfahani v. Gee*, 625 F.2d 1313, 1315 (11th Cir. 2010) (per curiam) (quoting *Scott v. Harris*, 550 U.S. 372, 380) (2007)).

[7] *Id*. (internal quotation marks omitted).

[8] *Envtl. Defense Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

On September 14, 1984, the Kwickie Food Store on Wellborn and Wall Streets in Warner Robins was robbed, and the clerk, Taressa Stanley, was shot and later died from her injuries. Two detectives in the Warner Robins Police Department, Malcom Derrick, a lieutenant in the Criminal Investigations Division (and a Defendant in this case), and James Miller[9] (now deceased), investigated the armed robbery and murder. Miller was the lead investigator, and Defendant Derrick supervised and assisted Miller in the investigation.

Officer Dawn Bowser was the patrol officer who first responded to the call that a suspect had robbed the Kwickie Store and shot the clerk with a small-caliber weapon. The case was assigned to Miller. Miller and Lieutenant Derrick both arrived at the Kwickie Store around 9:00 p.m. Upon arrival, Defendant Derrick went inside to observe the scene, which included an open door to the cooler where beer was kept and blood on the floor behind the counter.

Derrick had been at the store about 20 minutes when a citizen named Mark Davis voluntarily approached Officer Bowser, who was outside the store. Davis asked Officer Bowser if someone had been shot, and, if so, whether a small-caliber weapon had been used. Officer Miller then went outside to speak with Davis. Davis told Miller he believed Timothy Johnson (Plaintiff) had committed the crime because Davis had

---

[9] James Miller is not related to Defendant Deborah Miller.

heard Plaintiff plan the crime and had seen a .22 pistol in Plaintiff's possession. Miller

relayed to Defendant Derrick the information Davis gave.[10]

Defendant Derrick then went outside and personally spoke with Davis. Davis

told Derrick that a week before, Davis had driven Plaintiff to the area where the

Kwickie Store was located and let him out. Davis saw Plaintiff go down the path

towards the store, and then Plaintiff got back in the car. Davis took Plaintiff home, and

Plaintiff told him to wait. Plaintiff then came out of the house with a long barrel,

small-caliber revolver with the handle wrapped in black tape, and said, "I'm going to

hit that store," or words to that effect.

Davis volunteered all of this information to the officers, with no payment or

favor from the officers. In addition, Derrick was personally familiar with Davis.

Derrick knew that the Houston County Sheriff's Office ("H.C.S.O.") had used Davis as

an informant on prior occasions, and the information Davis had given the H.C.S.O.

had proven to be truthful. Moreover, Davis had directly provided Derrick with

truthful information in the past. Defendant Derrick, however, did not run a criminal

[10] Plaintiff objects as hearsay to the statements informant Davis gave to officers Bowser and Miller, which Miller relayed to Defendant Derrick. Plaintiff's objections, however, are **OVERRULED**. To the extent these statements were offered to prove the truth of the matters asserted, it is true they would be inadmissible hearsay. However, the statements reflect the information the officers possessed, whether true or not, at the time they acted to apply for the arrest warrant. Police officers may base assessments of probable cause on hearsay and may seek arrest warrants on the basis of hearsay. What Lieutenant Derrick believed at the time he sought the arrest warrant is crucial to the issue of whether he had at least arguable probable cause to seek a warrant for Plaintiff's arrest. Thus, the Court will consider the statements only to the extent they are offered to show what Lieutenant Derrick thought to be probable cause to seek Plaintiff's arrest warrant.

history check on Davis, who had an extensive criminal history, and Derrick did not take any other steps at that time to corroborate Davis's tip regarding Plaintiff's involvement in the crime. At that time in 1984, the W.R.P.D. did not register or keep files on confidential informants, and it did not train or require officers to run criminal history checks, register, or maintain files on confidential informants.

Based on the information provided by Davis at the Kwickie Store, Defendant Derrick told Miller to find a justice of the peace to determine whether they could obtain an arrest warrant for Plaintiff. Miller executed a warrant affidavit, which stated in its entirety:

> Personally came Detective Jimmy Miller, W.R.P.D., who on oath says that to the best of his knowledge and belief, William [sic] Johnson did on the 14th day of September, in the year 1984, in the county aforesaid, commit the offense of Armed Robbery in said county, between the hours of 8:40 P.M. and ____ M., on the 14th day of September 1984. The place of occurrence of said offense being Houston County, Georgia Kwickie Food St. #29, corner of Wellborn Rd. & Wall St., Warner Robins and against the laws of the State of Georgia. Said offense being described as Accused allegedly robbed Kwickie Food St. #29 by use of an offensive weapon, a pistol. An undetermined amount of money was taken from the cash register. The clerk on duty was Teresa Stanley.[11]

Miller presented the affidavit to a magistrate, who issued an arrest warrant for Plaintiff.

While Miller secured an arrest warrant, officers continued to search the scene for evidence. The store manager reported that approximately $137.00 was missing

---

[11] Arrest Warrant [Doc. 66-4].

from the cash register. Officer Bowser found coins and a dollar bill behind the store, as well as a 12-pack of Budweiser. The carton was torn open, but the beer cans were unopened, and they were still cool to the touch even though it was a warm night. The beer and carton were secured into evidence by the crime scene investigator.

A BOLO (be on the lookout) was issued for Plaintiff, stating that warrants for his arrest had been issued. In the early morning hours of September 15, 1984, police dispatch notified officers that Plaintiff had been seen entering a residence at 130 Vickie Lynn Drive, which was the address of his girlfriend Shirley Brown where he was staying. Defendants Captain Dennard and Leiutenant West, two W.R.P.D. patrol officers, responded to that address.

At 2:46 a.m. on September 15, 1984, Captain Dennard identified Plaintiff as Timothy Johnson and arrested him for armed robbery and aggravated assault. Other than asking his name, Dennard did not ask Plaintiff any questions. Dennard drove him to the police station, booked him, and placed him in a holding cell. Lieutenant West accompanied Dennard. After Plaintiff was booked, Dennard and West returned to patrol.

At 3:40 a.m., Detectives Miller and Derrick interviewed Plaintiff at the police station. Plaintiff told the officers he had been at home, at his girlfriend's house, all day and night. He said he did not rob the store or shoot anyone. When asked if he would submit to a polygraph test, Plaintiff asked for a lawyer. The interview stopped, and

Miller returned Plaintiff to his cell. Miller then began to look for Mark Davis, the informant who identified Plaintiff as the perpetrator, to "question him more extensively to either consider [Davis] a suspect or dismiss him as a suspect."[12] Plaintiff states that after he returned to his cell, Lieutenant Derrick came to his cell and attempted to pressure him to confess to the crime or he "was going to make sure [Plaintiff] got fried."[13] That night, Miller and Derrick went to Plaintiff's girlfriend's house to seek to permission to search the home, but she did not answer the door.

On September 16, 1984, the clerk, Taressa Stanley, died. After attending the autopsy, Miller and Derrick returned to the Kwickie Store, and they, together with Defendants Captain Dennard and Detective Stephen Lynn, searched for the bullet that had killed the clerk. They removed all items from the shelves, inspecting each item for the bullet. After Dennard suggested moving the shelving, he found the bullet at 10:10 p.m., and it was secured into evidence.

The next day, on September 17, 1984, Miller and Defendant Derrick interviewed Plaintiff's stepfather, Tilman Densley, who Plaintiff stated was the only father he ever knew.[14] Densley told the officers he knew nothing about the crime, but he did tell them that Plaintiff's girlfriend, Shirley Brown, had called his wife and Plaintiff's mother,

---

[12] Miller Investigative Report [Doc. 62-1, p. 55].
[13] Pl. Depo., p. 65 [Doc. 50].
[14] *Id.* at pp. 218-19.

Gladys Densley, and asked Gladys to come to her house because Plaintiff was in trouble.[15]

Miller and Derrick then swore out a warrant against Brown for the offense of Party to a Crime (armed robbery) alleging she had information about the crime and was intentionally avoiding them. After obtaining the warrant, they again went to Brown's house. Miller found Brown with her mother entering the back door, and he placed Brown under arrest. After Miller explained to her that they were going to return with a search warrant, Brown gave consent to search her home and signed a consent-to-search waiver.

Brown walked to a closet and retrieved a black trash bag, which she gave to the officers. She said it contained Plaintiff's clothes, and she had nothing else of his. She explained that she had given the clothes to Plaintiff's mother to keep, but his mother returned them in case the police searched her home. Brown told the officers she had not seen any money, but she exhibited nervous behavior, and her statements were inconsistent.

The officers took Brown to the station, read her rights, and interviewed her. As a result of the inconsistent statements she gave, the officers stopped the interview, so she could be placed in a cell. When Miller took Brown to booking, he found a wad of

---

[15] Again, Plaintiff's hearsay objections to the statements from the individuals Miller and Derrick interviewed at the police station are **OVERRULED**. The Court is not considering these statements for the truth of the matter asserted. Rather, they are being considered to determine whether the officers had probable cause (or arguable probable cause) to continue to investigate Plaintiff for the crimes.

crumpled one-dollar bills in her pocket. Miller then took her back to the interview room and in front of Defendant Derrick, counted 39 one-dollar bills that Brown had removed from her pocket.

Meanwhile, Sergeant Noll processed the evidence that had been collected. He found a latent print on the beer carton that was found behind the store. That latent print matched Plaintiff's left palm print.

The next day, on September 18, 1984, Miller again interviewed Plaintiff's girlfriend. She told the officers she was ready to tell the truth. Brown said she also possessed a roll of coins, which she had placed in a trash can behind her house. When Plaintiff returned home the night of the robbery, he removed a wad of bills and rolled coins from his pockets. He had dirt and leaves in his pockets and told her not to ask questions. Plaintiff put the bills under the mattress and the coins in a drawer, and he acted very nervous, especially when any patrol car went by.

After their interview with Brown, Miller and Defendant Derrick took out warrants for Plaintiff's mother and stepfather. After Plaintiff's stepfather was arrested and confined, he sent word that he wanted to speak to Miller about the robbery. Plaintiff's stepfather said he knew where to find the gun used in the robbery. He directed Miller and Derrick to the exact location of the gun, which was in a tan bank bag in some bushes behind Northgate Plaza. The officers located the bag and requested Sergeant Noll to come out, take photographs, and process the evidence.

When the officers opened the bag, they saw the grip of the gun was wrapped in black electrical tape, indicating a problem with the handle or the grip.

The next day, on September 19, 1984, Miller interviewed Plaintiff's mother, Gladys Densley, who admitted she had accepted Plaintiff's clothing from Plaintiff's girlfriend Shirley Brown without knowing what Plaintiff had done. Plaintiff's mother drove Brown to Macon, where Brown hid the clothing under an acquaintance's house. After discussing the matter with her husband, Plaintiff's mother returned to Macon, retrieved the clothes, and returned them to Brown. The officers then arrested Plaintiff's mother.

On the same day, the officers interviewed Willie Roundtree. Roundtree stated that he had given Plaintiff a ride the night of the robbery to pick up some marijuana.

On September 20, 1984, Miller interviewed the informant Mark Davis. In addition to the information he had already provided the officers at the Kwickie Store on the night of the crime, Davis said that Plaintiff had told him about a prior robbery committed by Plaintiff's cousin, Gil Johnson, where the clerk of a convenience store was shot and wounded. Plaintiff told Davis that his cousin had made a mistake by leaving the clerk alive.

Miller and Derrick then interviewed Mathis Ward, who said Plaintiff had offered to sell him a .22 revolver before this incident. Ward identified the gun Plaintiff

tried to see him as having a long barrel that was missing either one or both sides of the grip.

Four days later, on September 24, 1984, Plaintiff was transferred from a holding cell at the W.R.P.D. to the Houston County Jail ("Jail). Also on that date, the District Attorney ("D.A.") interviewed Plaintiff's girlfriend, Plaintiff's stepfather, and informant Mark Davis. They were not in custody and came to the station voluntarily. The interviews were videotaped and transcribed by a court reporter. Lieutenant Derrick was present for the interviews.

During the interview, Plaintiff's girlfriend told the D.A. that Plaintiff had left home around 7:30 p.m. on the night of the robbery and returned home around 10:00 p.m. in a large yellow car. He then left against with Roundtree to buy marijuana and came back around 10:30 p.m. He acted nervous when patrol cars went by. She was afraid he had done something wrong, but she did not ask him what he had done. She saw him take money out of his pockets, and leaves and dirt came out as he took the money out. Plaintiff hid the money in the house, then took it outside, and then brought it back inside, even though she told him not to. After the police arrested Plaintiff, she called his mother to come get his clothes, which she had put in a plastic bag with the money. She stated she never saw the tan bank bag with the gun. She also explained that she and Plaintiff's mother hid the trash bag in Macon on the Saturday

following the crime, but Plaintiff's mother and stepfather returned it to her the next day, Sunday.

On September 27, 1984, Plaintiff's mother and stepfather and Willie Roundtree were polygraphed. The polygrapher from the Georgia Bureau of Investigations determined that Plaintiff's mother was not deceptive and that Roundtree's results were inconclusive. There was no finding about whether Plaintiff's stepfather was deceptive. The polygrapher noted that Plaintiff's stepfather admitted to going through the trash bag, removing the gun, taking out three bullets and the cartridge that had been fired, and taking $3.00 from the trash bag. Plaintiff's girlfriend and informant Mark Davis were polygraphed the next day. Davis was found to be truthful, but Brown showed signs of deception.

On October 5, 1984, Plaintiff appeared for a commitment hearing. Lieutenant Derrick testified about the evidence the W.R.P.D. had collected against Plaintiff, including Davis identifying him as a possible suspect, Plaintiff's stepfather leading officers to a gun reported to belong to Plaintiff, Plaintiff's palm print on the beer carton found behind the store, and an initial report from the G.B.I. that the bullet fired from the gun was the bullet that killed Taressa Stanley. Based on this evidence, the magistrate court found sufficient probable cause existed to present the case to the grand jury.

At some time in October, Plaintiff contends Defendant Deputy General Granville, a detention officer at the Jail, forced Plaintiff out of his cell and took him to a bridge where other unknown law enforcement officers and Defendant Derrick were waiting. While Derrick and Granville watched, several of the unknown officers grabbed Plaintiff and dangled him over the bridge, yelling at Plaintiff to sign a confession or else they would drop him over the bridge. Plaintiff, terrified, thought he was having a heart attack and asked to be taken to the hospital. The officers took him to the hospital. Plaintiff did not make any confession.

Also in October, Defendant Deborah Miller, a W.R.P.D. officer, sought the indictment of Plaintiff for an unrelated robbery at a convenient store on July 26, 1984. Miller does not remember interviewing Plaintiff about this robbery.

On November 13, 1984, the grand jury indicted Plaintiff on charges of armed robbery of the Kwickie Store and murder of Taressa Stanley.

On December 11, 1984, Plaintiff pled guilty to the September 1984 armed robbery and murder in exchange for the D.A. to not seek the death penalty. At the same time, he pled guilty to the July 26, 1984 armed robbery of a convenient store. Plaintiff states he pled guilty because he feared for his life and the fate of his family members who had been arrested. After he pled guilty, the charges against his family were dropped. Plaintiff was sentenced to serve three consecutive life sentences.

<u>2006 Prosecution</u>

On February 13, 2006, the Georgia Supreme Court determined that during the plea hearing, Plaintiff had not been advised of his right to confront witnesses or his right to avoid self-incrimination and vacated Plaintiff's guilty plea and sentence.[16]

Thus, On March 22, 2006, Plaintiff was transferred from the Georgia State Prison to the Houston County Jail to await re-trial. At booking, Plaintiff was classified as medium maximum security and placed in H-Pod in general population. During the booking process, Captain Johnson, who is now deceased, also placed a restriction on Plaintiff's movement within the facility that he had to be escorted by both a supervisory and a jailer when he moved from his Pod. This restriction was normally placed on a detainee arriving from the Georgia State Department of Corrections with a serious charge or a detainee who is known to be violent or prone to escape.[17] Plaintiff states he was the only detainee subjected to this restriction on movement. Being housed in H-Pod, Plaintiff occupied a single-person cell.

The District Attorney, Kelly Burke, intended to re-indict and re-try Plaintiff for the murder of Taressa Stanley. He asked the W.R.P.D. for all of the evidence related to the original investigation in 1984. Defendant Detective Mules was tasked with locating the evidence, reviewing it, and finding witnesses. In his search through the evidence, Mules discovered that much of the evidence had been destroyed. In addition, the gun

---

[16] *Johnson v. Smith*, 280 Ga. 235 (2006).
[17] Garett Depo., p. 61 [Doc. 60-1].

16

and the projectile were missing. He also discovered certain evidence without evidence tags, so he created new ones. This included the envelope containing the latent palm print on the beer carton and negatives of the crime scene, which he sent to a photo shop to be developed. Mules contacted the informant Mark Davis by telephone, but Davis refused to cooperate and would not confirm the statement he gave in 1984. Plaintiff's girlfriend in 1984, Shirley Brown, was suffering from a mental disorder.

On June 6, 2006, Mules testified about the evidence before a grand jury. Based on his testimony, the grand jury indicted Plaintiff for murder, and the D.A. indicated he would seek the death penalty. Plaintiff remained in the Jail for over seven and a half years, until he was re-tried in December of 2013, found not guilty, and released.[18]

Plaintiff's Confinement in Administrative Segregation

For the first three years of his confinement in the Jail awaiting re-trial, Plaintiff remained in H-Pod as a medium maximum detainee in general population. However, on May 15, 2009, the Pod assignments at the Jail were changed because particular pods, including H-Pod where Plaintiff was housed, were reaching capacity. As part of the restructuring, H-Pod was re-assigned as administrative segregation. Administrative segregation is designed for those detainees who cannot get along with other detainees or are required to be housed by themselves.

---

[18] The record does not indicate why it took over seven and a half years to re-try Plaintiff.

Defendant Margaret Hays, who worked at the Jail during this time and became head of the inmate Classification Committee in 2010, testified that during the pod restructure, detention officers asked the detainees housed in H-Pod, including Plaintiff, if they would like to go to general population. The detainees would either agree to go to general population, or say they feared for their lives or did not want to be housed in a cell with other inmates to avoid going to general population. Hays testified that Plaintiff told her he did not want to be housed with other detainees because "he'd been in prison, he knew what those children were like, he didn't want to have to deal with the noise and with their foolishness and he wanted a room by himself."[19] Thus, Plaintiff was allowed to stay in H-Pod.

Plaintiff, however, disputes this version of the facts. Plaintiff denies ever being asked to go to general population. Moreover, Plaintiff denies he ever told Defendant Hays or anyone else he wanted to remain in H-Pod in administrative segregation. Instead, Plaintiff claims he was classified, placed, and permanently confined in H-Pod in administrative segregation with no notice or opportunity for a hearing, and for no purpose other than punishment for his charged crimes.

The Jail's classification records do not reflect that Plaintiff voluntarily asked to stay in H-Pod. The records simply list his murder, armed robbery, and aggravated

_____

[19] Hays Depo., p. 286 [Doc. 63-1].

battery charges as the reasons for his placement in administrative segregation.[20] Plaintiff was provided no written notice or statement explaining why he was subjected to administrative segregation, nor was he provided with any opportunity to call witnesses or present evidence on his behalf. However, Plaintiff never complained or protested about remaining in administrative segregation at any time during his seven and half years incarcerated at the Jail.

Inmate classification reviews at the Jail happened periodically. After H-Pod was designated administrative segregation on May 15, 2009, it appears Plaintiff's classification to H-Pod was reviewed only three times—on March 12, 2010, June 16, 2010, and January 11, 2011.[21] Although Defendant Hays did not initially place Plaintiff in administrative segregation, she was the Chairperson of the Classification Committee and therefore determiner of Plaintiff's classification during the three reviews. During the January 11, 2011 review, Defendant Hays deemed Plaintiff's classification in administrative segregation permanent. Defendant Hays listed no reason for the "permanent" designation.[22] Plaintiff's classification was not reviewed for the next three years he remained incarcerated in H-Pod, until a jury acquitted him on December 5, 2013, and he was released from prison. In total, Plaintiff remained in segregation for four a half years—from May 2009, until December 2013. Plaintiff had

---

[20] Classification Rating Review, Ex. 28 [Doc. 61-1, p. 30].
[21] *Id.*
[22] *Id.*

no disciplinary charges or issues while housed at the Jail, and he never filed any complaint regarding his confinement in administrative segregation.

As a detainee in administrative segregation, Plaintiff's cell contained a bed and bedding, a toilet, a desk, and a stool. Plaintiff received writing materials, books, and all of his legal materials. There was a television in the communal area of the pod, although Plaintiff could not see the television from his cell. Plaintiff was allowed visitation and was allowed to serve as a trustee within his pod, helping the detention officer on duty with tasks within the pod. He was also part of the pod workforce, so he served food in the mornings and occasionally served food at lunch and dinner.

While locked in his cell, Plaintiff could only communicate with other inmates through the vent in the air conditioning system. Plaintiff could only exit his cell to shower and occasionally attend 30-minute yard calls. While on yard calls, Plaintiff was permitted to be outside in the jail yard, but he could not interact with other inmates.

On December 5, 2013, a jury acquitted Plaintiff of all charges, and he was released from jail. On November 9, 2015, Plaintiff filed this action asserting claims arising out of his 1984 arrest and prosecution, his 2006 prosecution, and his lengthy incarceration in administrative segregation while awaiting re-trial at the Jail. As discussed in detail below, Defendants are entitled to summary judgment on all of Plaintiff's claims with one exception—Plaintiff's substantive due process claim against Defendant Margaret Hays. Because a genuine issue of material fact exists as to

whether Plaintiff was permanently placed in administrative segregation as punishment, Defendant Hays is entitled to neither qualified immunity nor summary judgment.

## DISCUSSION

The Court first addresses several claims Plaintiff brought in his Complaint that he abandoned on summary judgment and several claims that are barred by the applicable statute of limitations. The Court then addresses Plaintiff's remaining claims on the merits.

## I.    Abandoned Claims

"When a non-moving party fails to address particular claims in the moving party's motion for summary judgment but responds to other arguments, the non-moving party abandons these claims."[23] Plaintiff alleged claims in his Complaint, failed to respond to Defendants' arguments regarding those claims on summary judgment, and therefore abandoned the following claims: (1) all claims against Defendant Stephen Lynn; (2) his official capacity claims against Defendants Dennard, West, Derrick, Miller, and Mules[24]; (3) any failure to intervene claim against Defendant

---

[23] *Johns v. CSX Transportation, Inc.*, 210 F. Supp. 3d 1357, 1373 (M.D. Ga. 2016) (citations omitted); *see also Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemd abandoned.").

[24] Plaintiff does address these claims in a footnote in his response to the City Defendants' Motion for Summary Judgment, simply stating the official capacity claims would not confuse the jury. Even assuming the footnote overcomes his abandonment of the official capacity claims, the Court hereby **DISMISSES** them as duplicative of Plaintiff's claims against the City. "An official-capacity suit is, in all respects other than name, to be treated as a suit against the entity [for which the official is an agent]."

Derrick; (4) all claims against Defendant Granville except a substantive due process claim regarding the attempted coercive confession; and (4) all claims for false arrest under Georgia law.

## II. Claims Barred by Statute of Limitations

Plaintiff asserts several claims that are barred by the applicable statute of limitations. "Federal courts apply their forum state's statute of limitations for personal injury actions to actions brought pursuant to 42 U.S.C. § 1983."[25] The statute of limitations for a Section 1983 claim in Georgia is two years.[26] Federal law, however, determines when the statute of limitations begins to run.[27] Generally, "the statute of limitations does not begin to run until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights."[28] "[T]he statute of limitations begins to run from the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured."[29]

---

*Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Thus, a suit against the Defendants in their official capacities is merely duplicative of Plaintiffs' claims against the City directly, and these claims are entitled to dismissal as such. *See Joiner v. Fulton County, Ga.*, 160 F. App'x 891 (11th Cir. 2005) (affirming district court's dismissal of claims against defendants in their official capacities as duplicative of the claims against the County).

[25] *Uboh v. Reno*, 141 F.3d 1000, 1002 (11th Cir. 1998).

[26] *Thigpen v. Bibb County, Georgia Sheriff's Dep't*, 223 F.3d 1231, 1243 (11th Cir. 2000); O.C.G.A. § 9-3-33.

[27] *Rozar v. Mullis*, 85 F.3d 556, 561 (11th Cir. 1996).

[28] *Id.* at 561-62 (internal quotation marks and citation omitted).

[29] *Helton v. Clements*, 832 F.2d 332, 335 (5th Cir. 1987).

An exception to the federal standard for accrual of a claim is the continuing violation doctrine, which the Eleventh Circuit has applied to Section 1983 cases.[30] "Under the continuing violation doctrine, the statute of limitations is tolled for a claim that otherwise would be time-barred where the violation giving rise to the claim continues to occur within the limitations period."[31] In other words, the doctrine "permits a plaintiff to sue on an otherwise time-barred claim when additional violations of the law occur within the statutory period."[32] "When the violation alleged involves a continuing injury, the cause of action accrues, and the limitation period begins to run, at the time the unlawful conduct ceases."[33] "The critical distinction in the continuing violation analysis. . . is whether the plaintiff [ ] complain[s] of the present consequence of a one-time violation, which does not extend the limitations period, or the continuation of that violation into the present, which does."[34] "Where a continuing violation is found, the plaintiff[ ] can recover for any violations for which the statute of limitations has not expired."[35]

Applying these standards, the following claims are barred by the statute of limitations.

---

[30] *See, e.g., Smith v. Shorstein*, 217 F. app'x 877, 881 (11th Cir. 2007) (citing *Lovett v. Ray*, 327 F.3d 1181, 1183 (11th Cir. 2003) (*per curiam*)).

[31] *Natl. Parks & Conservation Assn., Inc. v. Tenn. Valley Auth.*, 502 F.3d 1316, 1322 (11th Cir. 2007) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380-81 (1982)).

[32] *Robinson v. United States*, 327 F. App'x 816, 818 (11th Cir. 2007) (citing *Hipp v. Liberty Natl. Life Ins. Co.*, 252 F.3d 1208, 1221 (11th Cir. 2001)).

[33] *Id.* (citations omitted).

[34] *Lovett*, 327 F.3d at 1183 (quoting *Knight v. Columbus, Ga.*, 19 F.3d 579, 580-81 (11th Cir. 1994)).

[35] *Knight*, 19 F.3d at 581.

### A. Any Claim for Unlawful Arrest

It appears Plaintiff is only pursuing claims for malicious prosecution under Section 1983, and not a specific claim for unlawful arrest. Regardless, any Section 1983 claim for unlawful arrest is barred by the statute of limitations. "False arrest claims brought pursuant to § 1983, where arrest is followed by criminal proceedings, accrue when the claimant is detained pursuant to a legal process."[36] Here, Plaintiff was arrested in 1984 and then re-arrested in 2006. He did not file this lawsuit until 2015, well outside the two-year statute of limitations for both arrests. Thus, any claim for unlawful arrest under Section 1983 is time-barred.

### B. Officer Deborah Miller – Malicious Prosecution for July 26, 1984 Armed Robbery

Plaintiff's federal and state malicious prosecution claims against Defendant Deborah Miller are also time-barred. Deborah Miller is the officer who investigated the July 26, 1984 armed robbery for which Plaintiff was indicted and pled guilty at the same time he pled guilty to the September 14, 1984 armed robbery and murder of Taressa Stanley. Plaintiff contends Officer Miller maliciously prosecuted Plaintiff for the July 26, 1984 robbery knowing no evidence linked Plaintiff to that crime; instead, she used it simply as a means to pressure Plaintiff to plead guilty for the September armed robbery and murder.

---

[36] *See e.g., Jones v. Union City*, 450 F. App'x 807, 808-809 (11th Cir. 2011) ("We have held that the statute of limitations for § 1983 claims begins to run when facts supporting the cause of action are or should be reasonably apparent to the claimant..") (citation omitted).

Plaintiff's plea to the July 26, 1984 robbery charge was overturned on February 13, 2006, and Plaintiff was not re-indicted on that charge. Thus, Plaintiff had two years from February 13, 2006, to file a malicious prosecution suit against Defendant Miller.[37] Plaintiff did not file suit until 2015, well outside Georgia's two-year statute of limitations. Thus, this claim is time-barred.

### C. Substantive Due Process Claim Related to Defendant Granville's Attempted Coercive Confession

For the first time in any of Plaintiff's trials, appeals, hearings, motions, and habeas proceedings,[38] Plaintiff asserts that Defendant Granville, a detention officer at the Jail in 1984, continually pressured Plaintiff to confess to Taressa Stanley's murder, and in October 1984, Granville forced Plaintiff out of his cell and took him to a bridge where other unknown law enforcement officers and Detective Derrick were waiting. While Derrick and Granville watched, several officers grabbed Plaintiff and dangled him over a bridge, yelling at him to confess or he would be dropped. Plaintiff

---

[37] See Uboh v. Reno, 141 F.3d 1000, 1003 (11th Cir. 1998); Reese v. City of Atlanta, 247 Ga. App. 701, 703 (2001) ("A malicious prosecution action must be brought within two years after termination of the underlying prosecution in plinaitff's favor.").

[38] Plaintiff filed his first petition to withdraw his guilty plea on February 13, 1985, two months after entering his plea, claiming he was innocent and his counsel was ineffective. On April 5, 1991, Plaintiff filed a motion to withdraw his guilty plea, claiming the judge, the D.A., and his lawyer conspired against him because he is black and the victim was white. Plaintiff later filed a petition for writ of habeas corpus, and a hearing was conducted in October 2003. When questioned by the judge as to why he pleaded guilty, Plaintiff testified he was forced to enter a guilty plea because his lawyer was unprepared for trial, they had picked an all-white jury, and his parents and girlfriend were facing charges. At no time in any of those pleadings did he contend he had been threatened by officers and dangled from a bridge in attempt to force him to confess to the murder.

contends Defendant Granville violated his substantive due process rights by attempting to coerce him to confess.

Plaintiff's claim, however, is barred by the statute of limitations. The alleged attempted coercion occurred in October 1984. Plaintiff filed his claim in 2015, over 30 years after the conduct occurred. The continuing violation doctrine does not save Plaintiff's claim. Even assuming, for purposes of summary judgment, the coercion played a role in Plaintiff's decision to plead guilty, his conviction as a result of that plea was overturned in 2006. Thus, he would have had until 2008 to file suit.

Plaintiff's remaining claims are not barred by the statute of limitations and thus are addressed on the merits below.

## III.    Section 1983 Claims

Section 1983 provides a private cause of action against those who, under color of law, deprive a citizen of the United States of "any rights, privileges, or immunities secured by the Constitution and laws."[39]  A plaintiff may bring a § 1983 claim against a governmental entity or person in his individual or official capacity.[40]  Here, Plaintiff alleges that Defendants, through their various acts performed under color of law, maliciously prosecuted him in 1984 and 2006, and deprived him of substantive and procedural due process in violation of the Fourteenth Amendment.  Accordingly, Plaintiff must prove that (1) Defendants acted "under color" of law as defined by §

---

[39] 42 U.S.C. § 1983.
[40] *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991).

1983 and cases interpreting that language, and (2) Defendants' actions deprived them of a constitutional right. There is no dispute Defendants were acting under color of law. Thus, the issue before the Court is whether, through Defendants' conduct, Plaintiff suffered a deprivation of a clearly established constitutional right.

Plaintiff brings individual liability claims for malicious prosecution against Defendant W.R.P.D. officers Dennard, West, Derrick, and Mules; individual liability claims against Defendants Margaret Hays and Sheriff Talton for violation of Plaintiff's substantive and procedural due process rights while confined in administrative segregation; and a municipal liability claim against the City of Warner Robins for failure to implement adequate policies and failure to train officers on using confidential informants. As set forth in detail below, all Defendants are entitled to summary judgment on all of Plaintiff's claims except Plaintiff's substantive due process claim against Defendant Margaret Hays. The Court will begin its discussion with Plaintiff's individual capacity claims.

A. **Individual Capacity Claims and Qualfied Immunity**

In response to Plaintiff's individual liability claims, Defendants all argue that they enjoy qualified immunity and are therefore shielded from suit and liability. "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known."[41] Indeed, qualified immunity offers complete protection for "all but the plainly incompetent or one who is knowingly violating the federal law."[42] In order to receive qualified immunity, the officer "must first prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'"[43] Once a defendant proves that he was performing a discretionary function, the burden shifts to the plaintiff to show that the grant of qualified immunity is unmerited.[44]

Here Plaintiff does not dispute that Defendants were acting with discretionary authority. Thus, Plaintiff must establish he suffered a violation of his constitutional rights and, if so, that the illegality of Defendants' actions was "clearly established" at the time of the alleged violation.[45] The question need not be answered in a particular order.[46]

### 1. Malicious Prosecution Claims Regarding 1984 and 2006 Prosecutions

The Eleventh Circuit "has identified malicious prosecution as a violation of the Fourth Amendment and a viable constitutional tort cognizable under § 1983."[47] A

---

[41] *Kingsland v. City of Miami*, 382 F.3d 1220, 1231 (11th Cir. 2004) (internal quotation marks omitted).
[42] *Oliver v. Fiorino*, 586 F.3d 898, 904 (11th Cir. 2009) (internal quotation and citation omitted).
[43] *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991) (quoting *Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir. 1988)).
[44] *Oliver*, 586 F.3d at 905 (citing *McCullough*, 559 F.3d at 1205).
[45] *Oliver*, 586 F.3d at 905 (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)).
[46] *Pearson*, 555 U.S. at 236.
[47] *Wood v. Kesler*, 323 F.3d 872, 881 (11th Cir. 2003). Any claims Plaintiff brings for malicious prosecution under the Fourteenth Amendment are hereby **DISMISSED**: [T]he substantive due process component of the Fourteenth Amendment did not provide the constitutional source of a right to be free from malicious

viable § 1983 malicious prosecution claim requires a plaintiff to prove (1) the elements of a common law tort of malicious prosecution; and (2) a violation of his Fourth Amendment right to be free from unreasonable seizures.[48] The lynchpin in both of these prongs is probable cause.[49] The "presence of probable cause defeats a claim of malicious prosecution."[50]

"Probable cause exists where the facts and circumstances within the collective knowledge of the law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe an offense has been or is being committed."[51] "Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction."[52] Instead, it is a nontechnical, pragmatic approach that evaluates the facts of the case using the totality of the circumstances.[53]

Here, the Court must also consider the Defendants' assertion of qualified immunity. To be shielded by qualified immunity from a claim of unlawful arrest, an

---

prosecution. . . . [T]he Fourth Amendment is the appropriate source of the right to be free from malicious prosecution." *Id.* (citing *Albright v. Oliver*, 510 U.S. 266 (1994)).

[48] *Kingsland*, 382 F.3d at 1234.

[49] To establish the elements of a malicious prosecution claim in Georgia, "a plaintiff must show the following: (1) a criminal prosecution; (2) instigated without probable cause; (3) with malice; (4) pursuant to a valid warrant, accusation, or summons; (5) that terminated in the plaintiff's favor; and (6) caused the plaintiff damage."*Dixon v. Krause*, 333 Ga. App. 416, 419 (2015) (citation omitted). Under the Fourth Amendment, an arrest becomes constitutionally unreasonable if done without probable cause. *Kelly v. Serna*, 87 F.3d 1235, 1241 (11th Cir. 1996) (citing *Day Realty Assocs. Inc. v, McMillan*, 247 Ga. 561 (1981)).

[50] *Black v. Wigington*, 811 F.3d 1259, 1267 (11th Cir. 2016).

[51] *United States v. Jimenez*, 780 F.2d 975, 978 (11th Cir. 1986) (internal quotation marks and citation omitted).

[52] *Adams v. Williams*, 407 U.S. 143, 149 (1972).

[53] *Maryland v. Princle*, 540 U.S. 366, 370 (2003).

officer need not have actual probable cause, but only arguable probable cause.[54]

Arguable probable cause exists where "reasonable officers in the same circumstances and possessing the same knowledge as the [d]efendants could have believed that probable cause existed to arrest [the] plaintiff."[55] "Indeed, it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and in such cases those officials should not be held personally liable."[56] This objective standard does not evaluate the officer's subjective intent or beliefs.[57] Thus, "even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity."[58] Plaintiff bears the burden to "demonstrate that no reasonable officer could have found probable cause under the totality of circumstances."[59]

Moreover, "[a] grand jury indictment constitutes *prima facie* evidence that probable cause existed for the prosecution."[60] "A jury verdict is conclusive proof of probable cause unless there was fraud."[61] Here, since Plaintiff was indicted and convicted, "he must point to specific facts tending to show that probable cause did not

---

[54] *Holmes v. Kucynda*, 321 F.3d 1069, 1079 (11th Cir. 2003).
[55] *Kingland v. City of Miami, Fla.*, 382 F.2d 1220, 1232 (11th Cir. 2004) (citation omitted).
[56] *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990).
[57] *Rushing v. Parker*, 599 F.3d 1263, 1266 (11th Cir. 2010).
[58] *Holmes*, 321 F.3d at 1079 (internal quotation marks and citation omitted).
[59] *Kingsland*, 382 F.3d at 1232.
[60] *Kelly v. Serna*, 87 F.3d 1235, 1241 (11th Cir. 1996) (citing *El-Amin v. Trust Co. Bank*, 171 Ga. App. 35 (1984)).
[61] *Id.* (citing *Monroe v. Sigler*, 256 Ga. 759 (1987)).

exist for his arrest and that the prosecution was motivated by malice."[62] Plaintiff fails to satisfy this standard.

### a. Officers Dennard and West—1984 Arrest

Plaintiff contends Officers Dennard and West, the officers who arrested Plaintiff in September 1984, are not entitled to qualified immunity because the arrest warrant they relied on was not facially valid, and therefore no probable cause or arguable probable cause existed for them to arrest Plaintiff. The Court disagrees.

Law enforcement officials executing a facially valid court order are protected by absolute quasi-judicial immunity.[63] Dennard and West merely executed Plaintiff's arrest based on information communicated to them by the police dispatcher that there was an active warrant for Plaintiff's arrest. "Ordinarily, where an arrest warrant has been issued, a police officer is entitled to rely on the magistrate's probable cause determination, as long as that reliance is objectively reasonable."[64] Plaintiff wholly fails to show any evidence a reasonable officer in Defendants Dennard and West's position would not have relied upon the independent probable cause determination made by the magistrate when he issued the arrest warrant for Plaintiff.[65]

---

[62] *Id.* (citing *Abonghae v. Circuit City Stores, Inc.*, 214 Ga. App. 561 (1994)).
[63] *Roland v. Phillips*, 19 F.3d 552, 555 (11th Cir. 1994).
[64] *Harris v. Goderick*, 608 F. App'x 760, 762 (11th Cir. 2015) (citing *United States v. Leon*, 468 U.S. 897, 922-25 (1984)).
[65] *Id.* at 763.

Plaintiff neither alleges nor establishes in any affidavit or deposition of record that in executing the warrant, Defendants Dennard and West acted in bad faith or with notice of any infirmity in the arrest warrant.[66] "Law enforcement officials must not be called upon the answer for the legality of decisions which they are powerless to control or be required to act as pseudo-appellate courts scrutinizing the orders of judges."[67] "A policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, (or as here, a warrant) and being mulcted in damages if he does."[68] "It would be a strange and unworkable rule that required a[n officer], at his peril, to determine the ultimate legal validity of every warrant regular on its face and issued by proper authority before serving it."[69]

Moreover, Plaintiff has not shown, nor has this Court found on its own, any Eleventh Circuit or Supreme Court case addressing the reasonableness, and thus constitutionality, of relying on the statement of a dispatcher that an active warrant for arrest has been issued. Thus, the state of the law in 1984 at the time of Plaintiff's arrest certainly did not give Defendants fair warning that arresting Plaintiff based on a

---

[66] *Turner v. Raynes*, 611 F.2d 92, 93 (5th Cir. 1980).
[67] *Roland*, 19 F.3d at 556 (internal quotation marks and citation omitted).
[68] *Turner*, 611 F.2d at 93 (quoting *Pierson v. Ray*, 386 U.S. 547, 555 (1967)).
[69] *Id.*

police dispatcher stating there was an active arrest warrant was unconstitutional. Thus, Defendants Dennard and West are entitled to qualified immunity.[70]

### b. Officer Malcolm Derrick—1984 Arrest and Prosecution

Plaintiff contends Lieutenant Derrick is not entitled to qualified immunity because he relied solely on informant Mark Davis's tip to arrest and further prosecute Plaintiff, and Davis was not reliable. Again, the Court disagrees.

Officer Derrick oversaw the investigation of the September 14, 1984 armed robbery and murder. He helped gather information to present to the magistrate to determine whether probable cause existed for an arrest warrant, and he authorized Officer Jimmy Miller to obtain an arrest warrant for Plaintiff. As a basis for seeking the arrest warrant, Derrick relied on information from informant Mark Davis identifying Plaintiff as the perpetrator of the crime. "In determining whether an informant's tip rises to the level of probable cause, [the court must] assess the totality of the circumstances."[71] The Court considers "the relevance of factors such as the informant's 'veracity,' 'reliability,' and 'basis of knowledge.'"[72]

The information informant Davis provided to Derrick and the other officers was reasonably trustworthy to support probable cause, and certainly enough to present to the magistrate to determine whether probable cause existed for an arrest

---

[70] *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002).
[71] *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996) (citation omitted).
[72] *Id.* (citing *Illinois v. Gates*, 462 U.S. 213, 230 (1983)).

warrant. Derrick knew Davis to be a reliable informant, as Davis had previously provided information directly to Derrick, and Derrick knew Davis had provided prior information to the H.C.S.O. that had proven trustworthy.

Davis informed Derrick that Plaintiff had told Davis the week before that Plaintiff was going to rob the Kwickie Store on the corner of Wellcorn and Wall Streets. During that conversation, Plaintiff showed Davis a small-caliber (.22) handgun with black tape on the grip. Although the officers had not yet recovered the bullet or weapon at the time Davis provided this information, they had determined that the clerk had been shot with a small-caliber weapon. Thus, Derrick had information from a reliable source, who had a personal basis of knowledge, and whose information about the type of weapon used was corroborated by independent police work. Indeed, based on this evidence, the magistrate issued an arrest warrant. "The fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as [the Eleventh Circuit] sometimes put[s] it, in 'objective good faith.'"[73] This is certainly not a case where the information obtained was "so obvious that no reasonably competent officer would have concluded that a warrant should issue [such as] a deliberately or recklessly false affidavit."[74]

---

[73] *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quoting *United States v. Leon*, 468 U.S. 897, 922-23 (1984)).
[74] *Id.*

After Plaintiff's arrest, Derrick had additional information to support the probable cause necessary to hold Plaintiff in jail, continue investigation, and charge him with armed robbery and murder. Plaintiff's mother told police she had tried to conceal the clothes Plaintiff wore the night of the murder, not knowing what crime Plaintiff had committed. Plaintiff's stepfather told police he had found a gun in the bag containing Plaintiff's clothes, and that gun (which had black tape on the grip) proved to be the murder weapon. Plaintiff's girlfriend told police that Plaintiff had rolled coins and money on the night of the robbery. And Plaintiff's palm print was found on the carton of cool beer behind the store. Indeed, based on this evidence, the grand jury indicted Plaintiff on armed robbery and murder, and a jury later convicted him. Thus, Derrick had probable cause (and certainly arguable probable cause) for Plaintiff's 1984 prosecution.

### c. Officer Mules—2006 Indictment and Prosecution

Plaintiff contends Officer Mules initiated the re-prosecution of Plaintiff in 2006 without probable cause as evidenced by the following facts: (1) no gun or projectile was in the evidence; (2) the evidence of his fingerprint on the beer carton was not properly tagged nor was the chain of custody established; and (3) the informant Mark Davis refused to cooperate or confirm his statement. Regardless of whether Mules simply summarized the evidence from 1984 and therefore cannot be liable for the prosecutor's decision to prosecute Plaintiff, the evidence was sufficient to establish

probable cause, and certainly arguable probable cause, for Plaintiff to be re-tried. The G.B.I. reports matched Plaintiff's palm print to the one found on the beer carton and the bullet that killed the clerk to a gun identified as belonging to Plaintiff. "Where the uncontroverted evidence shows that there was some slight circumstances pointing to his guilt, though not enough to exclude every other reasonable hypothesis, there is no claim for malicious prosecution."[75]

### 2. Claims Regarding Plaintiff's Confinement to Administrative Segregation

Plaintiff contends while he was incarcerated at the the Jail as a pretrial detainee awaiting his retrial, he was inexplicably placed in administrative segregation in May 2009, and then, in January 2011, while she was the Chairperson of the Classification Committee, Defendant Hays designated his placement permanent, with no notice or hearing. Plaintiff remained in administrative segregation for a total of four and a half years, from initial placement in May 2009, until a jury acquitted him in December 2013. After Defendant Hays deemed his placement in administrative segregation permanent in 2011, Plaintiff received no further review of his placement, and he remained in administrative segregation for almost three years. Plaintiff claims during that time, he was housed in a cramped cell and deprived of interaction with other human beings. He could only exit his cell to shower and occasionally attend 30-minute "yard calls," where he could not interact with other inmates. Plaintiff contends Sheriff

---

[75] *Kelly*, 87 F.3d at 1241.

Talton knew he remained in administrative segregation for the entire time he was there.

Plaintiff brings claims against Defendant Hays and Defendant Sheriff Talton in their individual capacities for violations of his substantive and procedural due process rights.[76] Defendants assert they are qualifiedly immune from liability. As explained below, a genuine issue of material fact exists as to whether Defendant Hays permanently designated Plaintiff for administrative segregation as punishment, with no periodic review after 2011, where he remained for almost three years. Precedent in this Circuit clearly established that such punitive punishment was a violation of a pretrial detainee's substantive due process rights. Thus, the Court must deny summary judgment on Plaintiff's substantive due process claim against Defendant Hays. As to Plaintiff's remaining claims however, Defendants Hays and Talton are entitled to qualified immunity.

a.  <u>Substantive Due Process</u>

Plaintiff first contends his prolonged incarceration in administrative segregation at the Jail while a pretrial detainee violated his clearly established substantive due process rights under the Fourteenth Amendment. "[T]he conditions

---

[76] Plaintiff also alleges the conditions to which he was subjected to while in administrative segregation amounted to cruel and unusual punishment in violation of the Eighth Amendment. The Eighth Amendment, however, is inapplicable to pretrial detainees. A pretrial detainee's remedy for treatment that constitutes cruel and unusual punishment is under the substantive component of the Due Process Clause. *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996). Thus, Plaintiff's Eighth Amendment conditions of confinement claim is hereby **DISMISSED**.

under which a pretrial detainee are held are reviewed under the Due Process Clause of the Fourteenth Amendment."[77] The Due Process Clause protects against deprivations of "life, liberty, or property without due process of law."[78] Plaintiff contends the conditions under which he was held deprived him of a liberty interest.

"The Supreme Court established the standard for substantive due process claims raised by pretrial detainees in *Bell [v. Wolfish*, 441 U.S. 520 (1979)]."[79] *Bell* established that due process prohibits a state from punishing a pretrial detainee at all until he is lawfully convicted of a crime.[80] The government "may detain him to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment or otherwise violate the Constitution."[81] "To determine whether a condition of pretrial detention amounts to punishment, we must decide whether the condition is imposed for the purpose of punishment or whether it is incident to some legitimate governmental purpose."[82] A showing of intent to punish suffices to show unconstitutional pretrial punishment.[83] "An intent to punish may be inferred when a condition of pretrial detention is not reasonably related to a legitimate governmental

---

[77] *Jacoby v. Baldwin County*, 835 F.3d 1338 (11th Cir. 2016) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).
[78] U.S. Const.amend. XIV.
[79] *Id.*
[80] *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).
[81] *Jacoby*, 835 F.3d at 1344-45 (quoting *Bell*, 44 U.S. at 536-37).
[82] *McMillian v. Johnson*, 88 F.3d 1554, 1564 (11th Cir. 1996) (citing *Bell*, 441 U.S. at 538).
[83] *Id.* (citations omitted).

goal; for example, an intent to punish may be inferred when the condition is excessive in relation to the legitimate purpose assigned to it."[84]

"*Bell* effectively creates a two-part test. First, a court must ask whether any 'legitimate goal' was served by the prison conditions. Second, it must ask whether the conditions are 'reasonably related' to that goal."[85] Finally, to defeat Defendants' claims of qualified immunity, Plaintiff "must point to precedent that would give [Defendants] fair warning that these requirements would not be met under the conditions of confinement [Plaintiff] says he experienced."[86] As explained below, Plaintiff has satisfied these requirements in regard to his claim against Defendant Hays, but he has not met this burden in regard to his claim against Sheriff Talton.

(1) Defendant Hays

Plaintiff has presented sufficient evidence to raise a genuine issue of material fact as to whether Defendant Hays permanently placed Plaintiff in administrative segregation solely for the purpose of punishing him, thereby meeting the *Bell* test.[87]

---

[84] *Id.* (citations omitted).
[85] *Jacoby*, 835 F.3d at 1345.
[86] *Id.*
[87] The Court notes that because a genuine issue of material fact exists that Plaintiff was permanently assigned to administrative segregation for the purpose of punishment, using the test articulated by the Supreme Court in *Bell* to evaluate Plaintiff's substantive due process claim does not conflict with the Eighth Amendment deliberate indifference standard used by the Eleventh Circuit in *Hamm v. DeKalb County*, 774 F.2d 1567 (11th Cir. 1985), to evaluate the general conditions of pretrial incarceration experienced by that plaintiff. In *Hamm*, the Eleventh Circuit held that "in regard to providing pretrial detainees with such basic necessitites as food, living space, and medical care the minimum standard allowed by the due process clause is the same as that allowed by the Eighth Amendment for convicted persons." *Id.* at 1574. In *Hamm*, no issue existed as to whether the conditions were imposed as punishment. Instead, the pretrial detainee was complaining that the general conditions of his lawful

At the time of Plaintiff's incarceration in the Jail, inmates and detainess were removed from general population and confined to the generally less desirable amenities and daily regimens of administrative segregation for a variety of administrative reasons: to protect a prisoner's safety, to protect other inmates from a particular prisoner, or to break up disruptive groups of inmates or detainees. It is undisputed Plaintiff was not placed in administrative segregation for any of these reasons or for any violation of rules or disciplinary charges.

Defendant's stated reason for permanently keeping Plaintiff in administrative segregation is that Plaintiff's pod was being reassigned as an administrative segregation pod, and Plaintiff requested to remain there. Plaintiff, however, denies he made any such request. It is undisputed Plaintiff received no disciplinary infractions or charges while incarcerated at the Jail. Moreover, the documented reason for Plaintiff's placement and retention in administrative segregation was simply his murder, armed robbery, and aggravated battery charges; no official documentation reflects Plaintiff's alleged request to stay in administrative segregation. Viewing the

---

incarceration to await trial deprived him of the basic necessities and standards of living allowed by the due process clause. In contrast, this case presents the question whether Plaintiff was subjected to more severe conditions of incarceration (administrative segregation) simply for the purpose of punishment. Every published Eleventh Circuit case this Court found considering pretrial conditions of confinement claims of detainees housed in administrative segregation, solitary confinement, or other comparable restrictive confinement areas, evaluated the claims under *Bell. See McMillian v. Johnson*, 88 F.3d 1554 (11th Cir. 1996) (pretrial detainee's confinement to death row); *Wilson v. Blankenship*, 163 F.3d 1248 (11th Cir. 1998) (pretrial detainee's confinement to administrative segregation); *Magluta v. Samples*, 375 F.3d 1269 (11th Cir. 2004) (pretrial detainee's confinement to solitary confinement); and *Jacoby*, 835 F.3d 1339 (pretrial detainee in administrative segregation).

evidence in the light most favorable to Plaintiff, a jury could reasonably find Defendant Hays had no legitimate government purpose for permanently keeping Plaintiff in administrative segregation, and therefore it amounted to punishment for the crimes for which he was charged. Thus, a jury could reasonably find no "legitimate goal" was served by keeping Plaintiff in administrative segregation, and the less desirable conditions were not "reasonably related" to that goal.

However, to overcome Defendant Hays's qualified immunity defense, Plaintiff must show that clearly established law prohibited Hays from permanently assigning Plaintiff to administrative segregation for the purpose of punishment.[88] To be "clearly established," the law that the government official allegedly violated "must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that 'what [s]he is doing' violates federal law."[89] However, "[t]he issue for qualified immunity purposes [ ] is not whether the due process right not be punished before conviction was clearly established. The proper inquiry is whether it was clearly established that [permanently placing him in the conditions under which he was housed in administrative segregation] for the purpose of punishment violates due process."[90] The Court

---

[88] *Id.* at 1565 (citation omitted).
[89] *Id.* (quoting *Lassiter v. Alabama A&M University*, 28 F.3d 1146, 1149 (11th Cir. 1994)).
[90] *McMillian*, 88 F.3d at, 1565.

"evaluates particular pretrial detainee complaints against the *totality* of confinement conditions to determine if there is constitutional deficiency."[91]

Here, assuming the jury believes Plaintiff, the totality of Plaintiff's confinement conditions in administrative segregation violated clearly established law. In 2011, the law in this Circuit clearly prohibited permanently confining a pretrial detainee to administrative segregation, for an indefinite length of time, with no periodic administrative review, for the purpose of punishment, that ultimately lasted four and a half years.[92] As a result of being confined in administrative segregation, Plaintiff did not receive the same privileges of those detainees in general population. He was confined to a cramped cell where he could only communicate with other inmates through the pipes. He could only exit his cell to shower and occasionally attend 30 minutes of yard time, in which he could not interact with other inmates. Although these more restrictive conditions alone would not amount to unconstitutional punishment in violation of clearly established law, assuming (as this Court must at this stage of the proceedings) that Plaintiff as a pretrial detainee endured them as punishment for four and a half years, with no administrative review for almost three years, places this case clearly within a violation of his substantive due process rights.

---

[91] *Wilson v. Blankenship*, 163 F.3d 1284 (11th Cir. 1998) (citing *Hamm*, 774 F.2d at 1575-76).

[92] Whether analyzing Plaintiff's claim under *Bell*'s objective punishment standard for pretrial detainees or the Eighth Amendment's subjective deliberate indifference standard set forth in *Hamm v. Dekalb County*, 774 F.2d 1567 (11th Cir. 1985) to pretrial detainees, the outcome here is the same: The law under either standard was clearly established that a pretrial detainee's punitive, indefinite, lengthy confinement in administrative segregation was unconstitutional.

After Hays deemed Plaintiff's placement in administrative segregation permanent, Defendant never again reviewed his confinement in the more restrictive conditions. In 1979, the Supreme Court established that "administrative segregation may not be used as a pretext for indefinite confinement of an inmate. Prison officials must engage in some sort of periodic review of the confinement of such inmates."[93] Here, Defendant did not review Plaintiff's confinement after January 2011, and he ultimately spent three years in administrative segregation with no administrative review. Moreover, the fact Plaintiff spent such a prolonged duration confined to administrative segregation clearly implicated a violation of the Due Process Clause. "In *Bell*, the Supreme Court clarified that the relative brevity of a pretrial detainee's confinement allows special confinement that involves 'genuine privations and hardship,' which might be questionable under the Due Process Clause if they continued 'over an extended period of time.'"[94] Plaintiff spent a total of four and a half years in administrative segregation, three of which occurred after Defendant Hays deemed his confinement there permanent; such prolonged duration clearly qualifies as an "extended period of time." Finally, and most importantly, the law clearly prohibited confining Plaintiff to the more restrictive conditions of administrative segregation for the purpose of punishment. "An express purpose to punish establishes unconstitutional

---

[93] *Hewitt v. Helms*, 459 U.S. 460, 477 n. 9 (1983).
[94] *Wilson*, 163 F.3d at 1293 (quoting *Bell*, 441 U.S. at 542)).

pretrial punishment."[95] Thus, if a jury finds Defendant Hays intended to punish Plaintiff, "there is no question that [her] alleged conduct violated clearly established law."[96] For the foregoing reasons, Defendant Hays is not entitled to qualified immunity as to Plaintiff's substantive due process claim.

### (2) Sheriff Cullen Talton

Plaintiff also asserts Sheriff Talton violated his substantive due process rights. "[I]t is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of *respondeat superior* or vicarious liability."[97] "Instead supervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional violation."[98] However, "[t]he standard by which a supervisor is held liable in h[is] individual capacity for the actions of a subordinate is extremely rigorous."[99]

Here, no evidence shows Defendant Talton personally participated in any deprivation of Plaintiff's rights. Plaintiff's mere assertion that Sheriff Talton knew

---

[95] *McMillian*, 88 F.3d at 1565 (citing *Bell*, 441 U.S. at 538-39).

[96] *Id*. at 1566.

[97] *See Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (internal quotations and citations omitted).

[98] *See Cotton v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003).

[99] *Doe v. School Bd. of Broward County, Fla.*, 604 F.3d 1248, 1266 (11th Cir. 2010) (quotation marks omitted).

Plaintiff remained in administrative segregation is not enough to hold him personally responsible.

One way a plaintiff may establish a causal connection between the supervising official and the alleged constitutional violation is by showing that "the supervisor's improper custom or policy le[d] to deliberate indifference to constitutional rights."[100] Plaintiff, however, neither alleges nor points to any evidence showing that Sheriff Talton's failure to implement policies led to deliberate indifference to Plaintiffs' constitutional rights. Thus, Sheriff Talton is entitled to summary judgment on Plaintiff's substantive due process claim.

b. Procedural Due Process

Plaintff next contends he was punitively placed in administrative segregation without any notice or hearing, and therefore Defendant Hays and Defendant Talton violated Plaintiff's clearly established procedural due process rights. Plaintiff's claims, however, fail for multiple reasons.

First, it is undisputed neither Defendant Hays nor Talton initially placed nor classified Plaintiff for administrative segregation. More importantly, it is undisputed Plaintiff never filed a complaint, protested, or requested a hearing after his initial placement. In *Anderson v. Chapman*, the Eleventh Circuit found that the officer who classified the pretrial detainee for administrative segregation did not violate the

---

[100] *Douglas v. Yates*, 535 F.3d 1316, 1322 (11th Cir. 2008) (quotation marks omitted).

pretrial detainee's procedural due process rights where no evidence showed the detainee ever requested a hearing.[101] Thus, because Plaintiff did not complain about his condition, he cannot maintain a procedural due process claim.

However, even if Plaintiff's failure to request a hearing did not foreclose his procedural due process claims, no clearly established law would have put Defendants Hays and Talton on notice that placing Plaintiff in administrative segregation without a hearing would have denied him due process. "The Fourteenth Amendment due process safeguards that must be afforded both pretrial detainees and convicted inmates in prison disciplinary hearings are governed by *Wolf v. McDonnell*, 418 U.S. 539 (1974)."[102] "But for an inmate to be entitled to those safeguards, he must have an interest 'sufficiently embraced within Fourteenth Amendment "liberty" to entitle him to th[e] minimum procedures appropriate under the circumstances and required by the Due Process Clause.'"[103] In *Sandin v. Conner*,[104] the Supreme Court set forth the test for determining whether an inmate has a protected liberty interest. "This test examines the hardship imposed on the inmate relative to the 'basic conditions' of prison life."[105] Under this test, a liberty interest may arise in two circumstances: First, a liberty interest may arise from the Due Process Clause itself when an inmate's liberty is

---

[101] 604 F. App'x 810 , 815 (11th Cir. 2015).
[102] *Jacoby*, 835 F.3d at 1346 (citing *Bell*, 441 U.S. at 545).
[103] *Id*. (quoting *Wolf*, 418 U.S. at 557).
[104] 515 U.S. 472 (1995).
[105] *Jacoby*, 835 F.3d at 146-47 (quoting *Sandin*, 515 U.S. at 485).

restrained in a way that exceeds the sentence imposed by the court; and second, the State may create a liberty interest by conferring certain benefits to prisoners, the deprivation of which "imposes atypical and significant hardship on the inmate in realtion to the ordinary incidents of prison life."[106]

In 2016, the Eleventh Circuit in *Jacoby* clearly held that pretrial detainees "need not meet the *Sandin* standard to establish his right to a due process hearing before being placed in disciplinary segregation."[107] *Jacoby* clearly establishes that "a pretrial detainee is entitled to a due process hearing before being subjected to 'conditions [that] amount to punishment.'"[108] However, *Jacoby* cannot serve as clearly established law for Plaintiff's claims arising well before 2016. Prior to *Jacoby*, Eleventh Circuit "caselaw had not . . . given fair notice that pretrial detainees are entitled to a due process hearing before being punished for misconduct irrespective of the *Sandin* analysis."[109]

Analyzing Plaintiff's claim under *Sandin*, as this Court must, no caselaw clearly established the conditions Plaintiff endured in administrative segregation entitled him to procedural protections under the Due Process Clause before being punished. Although Plaintiff's conditions were more restrictive than those in general population, they did not "impose[] atypical and significant hardship on [Plaintiff] in relation to the

---

[106] *Sandin*, 515 U.S. at 484.
[107] *Jacoby*, 835 F.3d at 1348.
[108] *Id.* (quoting *Bell*, 441 U.S. at 535).
[109] *Id.* at 1350, fn. 6.

ordinary incidents of prison life."[110] Plaintiff had a bed and beding, a toilet, sink, mirror, desk, stool, writing materials, books, and legal materials; there was a television in the communal area of the pod. Plaintiff was allowed visitation; he could purchase items from commissary; he was allowed to serve as a "trustee" helping the jailer on duty with tasks within his pod; he could talk to other detainees through the vents; he was allowed "yard" time. Plaintiff does not allege, nor does any evidence indicate, the conditions in his cell posed any health or safety hazard. Thus, the conditions imposed upon Plaintiff did not cause a significant hardship on Plaintiff to implicate a constitutionally protected liberty interest. Defendant Hays and Defendant Talton are therefore entitled to qualified immunity on Plaintiff's procedural due process claims.

### B. Municipal Liability

Plaintiff also asserts a municipal liability claim against the City of Warner Robins, claiming its failure to implement adequate policies and failure to train and supervise its police officers on "how to handle" informants amount to deliberate indifference to his rights and the rights of persons like him who were arrested and investigated based on information received from unreliable informants; as a result, the City caused Officer Derrick to rely on an unreliable source and unlawfully initiate the arrest and prosecution of Plaintiff. The Court is unconvinced.

---

[110] *Sandin*, 515 U.S. at 484.

The Supreme Court has placed "strict limitations on municipal liability."[111] A municipality is liable under § 1983 only if it is "found to have _itself_ caused the constitutional violation at issue; [a municipality] cannot be found liable on a vicarious liability theory."[112] Instead, a municipality may be held liable for the actions of a police officer only when the municipal's policy or custom causes a constitutional violation.[113] To assert a claim under § 1983 against a municipality, "a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation."[114] Where the policy itself is constitutional, inadequate police training may establish § 1983 liability if "the failure to train amounts to deliberate indifference to the rights of persons with whom the police came into contact."[115]

First and foremost, the City is entitled to summary judgment because Plaintiff has failed to establish any violation of his constitutional rights. Since this Court has determined that Officer Derrick's conduct did not violate Plaintiffs' constitutional rights, the Court need not inquire into the City's policies and officer training relating

---

[111] _Gold v. City of Miami_, 151 F.3d 1346, 1350 (11th Cir. 1998).
[112] _Skop v. City of Atlanta_, 485 F.3d 1130, 1145 (11th Cir. 2007).
[113] _Id.; see also Gold_, 151 F.3d at 1350; _Monell v. Dep't of Soc. Servs. of City of New York_, 436 U.S. 658, 690 (1978).
[114] _McDowell v. Brown_, 392 F.3d 1283, 1289 (11th Cir. 2004) (emphasis added).
[115] _City of Canton, Ohio v. Harris_, 489 U.S. 378, 388 (1989).

to confidential informants in 1984.[116] However, even if Plaintiff had suffered some constitutional deprivation, he wholly fails to establish that either the City's lack of policies or the alleged inadequate officer training constitutes deliberate indifference to Plaintiffs' rights.

To establish deliberate indifference, "a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area nd the municipality made a deliberate choice not to take any action."[117] Such knowledge on the city's part may be established by showing, for example, "a history of widespread prior abuse by [d]epartment personnel that would have put the [City] on notice of the need for improved training or supervision."[118] Plaintiff points to no such evidence. Therefore, if the city has no notice of the need to train or supervise in a particular area, it cannot be liable as a matter of law for any failure to train or supervise.[119] Accordingly, Plaintiff's § 1983 claims against the City fail as a matter of law.

## IV.    State Law Claims

---

[116] *See Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996) ("[A]n inquiry into a governmental entity's custom or policy is relevant ony when a constitutional deprivation has occurred.") (citations omitted).

[117] *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998).

[118] *Wright v. Sheppard*, 919 F.2d 665, 674 (11th Cir. 1990).

[119] *Id.* (holding sheriff's department not liable for deputy's acts when no evidence of a history of widespread prior abuse put the sheriff on notice of the need for improved training or supervision).

Plaintiff also asserts claims against Defendants Derrick, Mules, and the City for malicious prosecution under Georgia law.[120] All Defendants, however, are entitled to summary judgment.

Plaintiff's malicious prosecution claim against the City is barred by O.C.G.A. § 36-33-3 which exempts municipalities from vicarious liability for the torts of their police officers.[121]

The individual Defendants are entitled to official immunity. "Under Georgia's doctrine of official immunity, state public officials generally cannot be held personally liable for discretionary acts performed within the scope of their official authority."[122] In Georgia, "an officer performing a discretionary act is entitled to official immunity unless he or she 'act[ed] with actual malice or with actual intent to cause injury.'"[123]

Despite Plaintiff's arguments to the contrary, Defendants Derrick and Mules's challenged actions in this case are discretionary. "[A] police detective [is] acting within [his] discretionary authority in investigating the case, obtaining search and arrest

---

[120] This Court has already found Plaintiff's malicious prosecution claims against Defendant Deborah Miller are barred by Georgia's two-year statute of limitations. Moreover, the Court has found Plaintiff abandoned all of his state law claims for false arrest. Even if Plaintiff had not abandoned his false arrest claims, Defendants would be entitled to summary judgment on those claims. The applicable cause of action in this case is malicious prosecution, not false arrest, since Plaintiff was arrested pursuant to a warrant, and the action was carried on to a prosecution. *Lagroon v. Lawson*, 328 Ga. App. 614, 620 (2014).
[121] O.C.G.A. § 36-3-33 states: "A municipal corporation shall not be liable for the torts of policemen or other officers engaged in the discharge of the duties imposed on them by law."
[122] *Davis v. Long*, 706 F. App'x 551, 556 (11th Cir. 2017) (citing *Cameron v. Lang*, 274 Ga. 122 (2001)).
[123] *Bateast v. Dekalb Cty.*, 258 Ga. App. 131 (2002) (alteration in orginal) (quoting *Todd v. Kelly*, 244 Ga. App. 404 (2000)).

warrants, and in executing those warrants."[124] Thus Defendants are entitled to official immunity, unless a genuine fact dispute exists on whether Defendants acted with actual malice or with actual intent to cause injury.

"[A]ctual malice as used in the context of official immunity requires a deliberate intention to do wrong."[125] "Actual malice does not include "reckless disregard for the rights or safety of others."[126] The record contains no evidence showing Defendant Mules acted with actual malice or with a "deliberate intention to do wrong" in summarizing the 1984 evidence and investigating the case in 2006.[127] Moreover, the Court is unconvinced Plaintiff's contention that Lieutenant Derrick's action in watching deputies dangle Plaintiff over a bridge to persuade him to confess establishes actual malice. Actual malice under Georgia law includes actions such as an officer arresting and prosecuting plaintiffs despite manufacturing evidence, knowingly presenting perjured testimony, coercing witnesses and then using the coerced testimony to prosecute, knowing an arrest and prosecution are wrong, without authority, or based on unreliable or untruthful information.[128] The record contains no such evidence here.

---

[124] *Marshall v. Browning*, 310 Ga. App. 64, 67 (2011).
[125] *Id.* at 758 (citing *Merrow v. Hawkins*, 318 Ga. 274 (1995)).
[126] *Murphy v. Bajjani*, 282 Ga. 197 (2007).
[127] *Adams v. Hazelwood*, 271 Ga. 414, 414-15 (1999).
[128] *See Lagroon*, 328 Ga. App. at 619-21.

However, even if Defendant Derrick is not entitled to official immunity, he is entitled to summary judgment. In Georgia, the gravamen of a malicious prosecution claim "is the absence of probable cause[.]"[129] "Lack of probable cause shall exist when the circumstances are such as to satisfy a reasonable man that the accuser had no ground for proceeding but his desire to injure the accused."[130] For the reasons discussed above, Derrick had probable cause to direct a warrant be obtained for Plaintiff's arrest and to continue investigating Plaintiff for murder.

## CONCLUSION

Based on the foregoing, the Court finds Defendants are entitled to summary judgment on all of Plaintiff's claims except Plaintiff's substantive due process claim against Defendant Margaret Hays. Thus, the City Defendants' Motion for Summary Judgment and Defendant Granville's Motion for Summary Judgment [Docs. 47 and 52] are **GRANTED**, and Defendants Talton and Hays' Motion for Summary Judgment [Doc. 53] is **GRANTED IN PART AND DENIED IN PART**. Specifically, that Motion is GRANTED on all of Plaintiff's claims against Defendant Sheriff Talton; it is GRANTED on Plaintiff's procedural due process and cruel and unusual punishment claims against Defendant Margaret Hays; and it is DENIED on Plaintiff's Section 1983 substantive due process claim against Defendant Hays.

---

[129] *Wal-Mart Inc. v. Blackford*, 264 Ga. 612, 613 (1994).
[130] *Lagroon*, 328 Ga. App. at 622 (quoting O.C.G.A. § 51-7-43).

**SO ORDERED,** this 28th day of February, 2018.

S/ C. Ashley Royal
C. ASHLEY ROYAL, SENIOR JUDGE
UNITED STATES DISTRICT COURT
